**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

MAURICE ROBINSON,                          )
                                           )
     Petitioner,                          )
                                           )
v.                                         )        Case No. 1:19 CV 181 SNLJ
                                           )
BILL STANGE and ERIC SCHMITT, [1]          )
                                           )
     Respondents.                         )

**MEMORANDUM AND ORDER**

This case is before the Court on a petition under 28 U.S.C. § 2254 for a writ of habeas corpus.  Petitioner Maurice Robinson is an inmate at the Southeast Correctional Center in Charleston, Missouri.  A jury found Robinson guilty of first-degree robbery, armed criminal action, and first-degree burglary.  The Mississippi County Circuit Court sentenced petitioner to concurrent 30-year sentences for first-degree robbery and armed criminal action and a consecutive 20-year sentence for first-degree burglary.  Respondents filed a response to this habeas petition, along with exhibits consisting of materials from the underlying state court proceedings.  Petitioner, through counsel, filed a reply.  Respondents concede the petition is timely filed.  *See* 28 U.S.C. § 2244(d).

---

[1] The Court substitutes as the respondent Bill Stange, the present warden of the Southeast Correctional Center ("SECC") where petitioner is incarcerated, in lieu of the former warden of the SECC who was named as a respondent at the time petitioner filed his habeas proceeding. Fed. R. Civ. P. 25(d); Rule 2(a) of the Rules Governing Section 2254 Cases in the United States District Courts.  Additionally, because petitioner is subject to consecutive sentences imposed by the trial court for the conviction he is challenging in his proceeding, the Court adds as a respondent Eric Schmitt, the Attorney General of the State of Missouri. *See id.* at Rule 2(b).

1

Petitioner now raises 11 claims: 2 due process claims; 6 ineffective assistance of counsel claims; and 3 claims of trial court error. He seeks reversal of his convictions and a new trial. The Court will deny petitioner's application.

## Background

The Missouri Court of Appeals summarized these relevant facts:

> In December 2008, Robinson had been working four to six months as a confidential informant for the city of Sikeston. Robinson contacted Bobby Sullivan ("Detective Sullivan"), a detective with the Sikeston Department of Public Safety, and tipped him off that Dewayne Andrews ("Dewayne")[2] was allegedly getting a shipment of cocaine either late Saturday night or early Sunday morning, December 7, 2008. At that time, Dewayne was staying at the home of Laronza Washington ("Washington"), located at 504 Lanning in Sikeston (sometimes referred to as "the residence" or "Washington residence"). Detective Sullivan told Robinson that he could not act immediately on the information and that it would be the first of the week. However, Detective Sullivan told Robinson to "keep an eye on it[,]" and once Robinson "heard they were in town" to page Sullivan.

> On December 6, 2008, Robinson was riding around in his car drinking with his good friends Fabayan Larry ("Larry"), Julius Hudson ("Hudson"), and Jerimiha Watson ("Watson").[3] They started talking about buying some cocaine and Robinson wanted Larry to see if Dewayne had any. Robinson dropped Larry off at the corner and Larry walked to the front door of the Washington residence and asked for drugs. Dewayne answered the door and Brandon Hamilton ("Hamilton") told Larry they did not have any drugs "at the time." Larry told the group he was told there were no drugs, and Robinson stated that "he [knew] something [was] there." The group then made plans to rob Dewayne at the Washington residence, changed into black

---

[2] "Because a portion of the involved parties share the same surname, for ease of reference, we may at times refer to the parties by their first names. We mean no familiarity or disrespect."

[3] "Robinson, Larry, Hudson and Watson are sometimes referred to collectively as 'the group.'"

clothes, and got two guns. Robinson then drove to Walmart and bought four orange ski masks and gloves in the sporting goods department.

At trial, Billy Landers, the sporting goods clerk at Walmart, testified Robinson bought "[s]ome masks and two pairs of gloves." Larry Strobel ("Strobel"), a Walmart customer, testified that Robinson caught his attention in the sporting goods section because he purchased "four masks and gloves." Strobel stated that a comment was made by one of his friends that it "looked kind of suspicious," and Robinson overheard the comment and responded. As they were walking out of the store, Robinson threatened to shoot them and told them that they "better have [their] 30/30 ready or whatever." After leaving Walmart, the group parked behind an abandoned house, approximately fifty yards away from the Washington residence. Robinson devised the robbery plan and, wearing orange ski masks, Larry and Watson went to the front door of the Washington home with the two guns, while Robinson and Hudson were let in the back door. Once inside the house, Larry and Watson woke up Dewayne.[4]

Dewayne was made to go into the kitchen and lie on the kitchen floor by individuals wearing orange masks and holding guns. He was told by one in the group to empty his pockets, and was struck in the face with a pistol. The group took "$1,200 and an ounce of cocaine" from him. Once the drugs were secured, the group left the house. Linnie was also assaulted during the robbery.[5]

Robinson was charged, as a prior offender, with the class A felony of first-degree murder (Count I), pursuant to section 565.020, for knowingly causing the death of Linnie by striking him on the head with a pistol and stomping on his head; the unclassified felony of armed criminal action

---

[4] "In addition to Dewayne and Hamilton, there were other family members and friends at the residence, including Dewayne's children; his uncle, Linnie Andrews ('Linnie'); and Gabriel Mitchell ('Mitchell'). During the robbery, Linnie was knocked to the floor; Hamilton and Mitchell were made to lie on the floor in the hallway; and the remaining occupants were in a back room."

[5] "Before leaving, Robinson allegedly stomped on Linnie's head while he was on the floor. Robinson and Linnie apparently had a previous altercation some weeks prior to the robbery. Linnie later died from complications of a closed-head injury suffered as a result of blunt-force trauma to the head."

3

(Count II), pursuant to section 571.015; the class A felony of first-degree robbery (Count III), pursuant to section 569.020, for forcibly stealing money and drugs from Dewayne and Linnie; the unclassified felony of armed criminal action (Count IV), pursuant to section 571.015; and the class B felony of first-degree burglary (Count V), pursuant to section 569.160, for knowingly entering the home at 504 Lanning for the purpose of committing robbery.

Robinson was tried by a jury in Mississippi County on November 14, 2011.  At trial, Dewayne testified he recognized Robinson as one of the robbers by his voice.  The following colloquy took place:

[State:] What were they saying when they were talking?

[Dewayne:] Like give me that shit.  Give me that shit, Nigger. Empty out your pockets.  I knew when I heard that voice I knew who it was.

[State]: Who was it?

[Dewayne:] [Robinson].

[State:] And how did you know his voice?

[Dewayne:] He got that raspy voice.  He got that raspy voice.

[State:] And what do you remember him saying to you?

[Dewayne:] "Give me that shit.  Empty your pockets."

[State:] Your Honor, I would ask [Robinson] if he could repeat that statement for the ladies and gentlemen of the jury please, "Give me that shit.  Empty your pockets."

[Defense Counsel:] I will object to that, Your Honor.  I want it noted for the record that we object to that.

4

The trial court then took a recess and heard argument from both attorneys outside of the jury's presence.  The trial court overruled defense counsel's objection and required Robinson to read the following phrase in front of the jury for voice identification purposes: "Where that shit at?  Empty your pockets, Nigger."  After making the statement, Dewayne identified Robinson as the voice he heard on the night of the robbery.  Dewayne testified that he recognized Robinson's voice because he had an accent—"southern kind of accent[.]"  Dewayne testified no one else said anything to him.

Detective John Blakely, Jr. ("Detective Blakely"), with the Sikeston Department of Public Safety, testified at trial because he was the detective on duty when the call came in regarding the subject burglary and assault.  His trial testimony took up 104 transcript pages.  Over the course of his testimony, Detective Blakely testified, without objection, to various statements made by co-defendants Larry and Hudson to him during the course of his investigation.

At trial, the State elicited evidence from numerous witnesses, without objection, that Robinson purchased orange ski masks and gloves at Walmart prior to the robbery.  Detective Blakely was one of the multiple witnesses that testified, without objection, that Robinson had been at Walmart buying ski masks prior to the robbery.  Detective Blakely reviewed the Walmart videotapes and testified that he saw Robinson on the video "buying hats" and a pair of gloves.  Detective Blakely testified he was told that Robinson had threatened two witnesses as they were leaving Walmart, and the two witnesses identified Robinson from a photo lineup.

Hudson and Larry both testified, without objection, that after the group decided to commit the robbery, they put on black clothes, got guns, and went to Walmart to get ski masks.  They both testified that Robinson went in Walmart and bought the masks by himself.  Hudson stated that Robinson "came back with the orange ski masks. [Robinson] said he had an altercation with some people in Wal-mart [sic] . . . threatening them I guess."

Robinson did not testify.

Doc. #10-5 at 2-6 (footnotes in original).

The following additional facts relate to petitioner's first two claims, which he did not raise in his state court proceedings.  Two other victims who were in the house during the crime, Brandon Hamilton and Gabriel Mitchell, testified at trial.  Both men knew petitioner before the burglary.  Hamilton and Mitchell were in a back room when petitioner and his friends entered the house.  Hamilton testified that before they saw anyone from the group, Mitchell said he heard "Red"—petitioner's nickname—say something and asked what petitioner was doing in the house.  When Hamilton went to the door of the back room, there were two people with guns and orange ski masks on.  He could not identify them because of the masks.  But, at some point, Hamilton heard petitioner say everyone in the room should lay down.  Hamilton recognized petitioner's voice and had no doubt that he heard petitioner in the house.  Hamilton did not talk to police right away after the crime because he had warrants and did not want to get arrested.

Mitchell testified to the following.  While he was in the back room, he heard someone kicking in a door elsewhere in the house and heard petitioner say, "get down."  At the time, Mitchell said it sounded like "Red."  Petitioner came into the back room and told them to come out into the hallway and get down on the ground.  Mitchell recognized petitioner at that point by his gold teeth.  Mitchell was incarcerated at the time of trial and had a pending charge against him.  He denied receiving any kind of offer in exchange for his testimony.  He also testified about his prior criminal record.

Petitioner's co-defendants, Hudson and Larry, both testified about their plea arrangements with the state and prior criminal records.

**Legal Standard**

"The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)." *Harrington v. Richter*, 562 U.S. 86, 97 (2011).  A district court can hear a petition for habeas corpus from a person in custody pursuant to a state court judgment only on the ground that the person "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Section 2254 bars relitigation of any claim "adjudicated on the merits" in state court unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or if it "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* § 2254(d); *see also Harrington*, 562 U.S. at 98.

A state court decision is contrary to clearly established federal law where the court either "applies a rule that contradicts the governing law" set forth by the Supreme Court or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to" the Court's. *Williams v. Taylor*, 529 U.S. 362, 405 (2000).  A state court decision involves an unreasonable application of federal law if the court "correctly identifies the governing legal principle from [Supreme Court] decisions but unreasonably applies it to the facts of the particular case." *Bell v. Cone*, 535 U.S. 685, 694 (2002).  "An unreasonable application of federal law is different from an

7

incorrect application of federal law . . . a state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101 (cleaned up). Habeas corpus is a "'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id.* at 102-03 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332, n.5 (1979)).

Under § 2254, a reviewing federal court is bound by the state court's factual findings unless the state court made a "decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* § 2254(d)(2). If an applicant failed to develop the factual basis of a claim in state court, the district court "shall not hold an evidentiary hearing on the claim unless the applicant shows that—(A) the claim relies on . . . (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2254(e)(2).

## Analysis

### 1. **Petitioner's due process claims (Claims 1 and 2) fail.**

Plaintiff first brings two due process claims, alleging Detective Blakely coerced prosecution witness Gabriel Mitchell to give false testimony against petitioner in exchange for leniency on his pending charges. Petitioner did not raise these claims in his prior

proceedings.   Petitioner submitted an unsigned affidavit, purportedly from Mitchell. Petitioner's counsel signed a separate affidavit claiming the Mitchell affidavit is based on a phone conversation he had with Mitchell.   Petitioner also submitted correspondence he alleges was from Mitchell to petitioner's sister, stating: "Tell red to have his lawyer get at me so we can free him up."  Doc. #26-3.   Although it is unclear at this point why petitioner has not been able to submit a signed affidavit from Mitchell, for the purposes of this petition, the Court will assume the Mitchell affidavit represents testimony he would give.

Mitchell's affidavit claims: (1) Mitchell's testimony that he saw petitioner at the scene was not true; (2) the man he identified as petitioner had enough hair that it could been seen despite his ski mask, but Mitchell had seen petitioner a couple days before and knew he had a shaved head at the time; (3) Mitchell was pressured to give this false testimony by Blakely, who promised Mitchell that pending charges against him would be dropped if he testified; (4) Mitchell lied when he testified that he did not receive any offers for his testimony; (5) despite doing what he was told, Mitchell still had to go to trial on his pending charge and was convicted; and (6) he decided to come forward because he feels bad about giving false testimony and wants to expose a pattern of dishonesty and misconduct by Blakely.

Respondent argues petitioner procedurally defaulted these claims because he did not raise them in his state court proceedings. *See Trevino v. Thaler*, 569 U.S. 413, 421 (2013); *Sweet v. Delo*, 125 F.3d 1144, 1149 (8th Cir. 1997); *Duley v. State*, 304 S.W.3d 158 (Mo. App. 2009); *Tisius v. State*, 183 S.W.3d 207 (Mo. banc 2006).   "In all cases in which a

state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

Petitioner claims he can show cause because he could not have known the facts underlying these claims during his state proceedings, as the State did not disclose Mitchell's false testimony or Blakely's alleged promise and Mitchell did not come forward until 2019. Cause for procedural default can include "a showing that the factual or legal basis for a claim was not reasonably available to counsel." *See Strickler v. Greene*, 527 U.S. 263, 283 and n.24 (1999) (cleaned up); *see also Banks v. Dretke*, 540 U.S. 668, 691 (2004) (explaining State's suppression of relevant evidence constitutes cause).

But even if petitioner has shown cause, he must also show prejudice to overcome his default. *See Coleman*, 501 U.S. at 750. To show prejudice, petitioner must show "a reasonable probability that the result of the trial would have been different" with this evidence. *Strickler*, 527 U.S. at 289 (cleaned up). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence," or, stated another way, whether the evidence at issue "could reasonably be taken to put the whole case in such a different light as to undermine

confidence in the verdict." *Id.* at 289-90 (quotation marks omitted). Petitioner has not made this showing for either due process claim.

**Claim 1.** Petitioner first claims the State violated his due process rights by suppressing evidence that Blakely promised Mitchell leniency in exchange for his testimony. *See id.* at 280. In this context, "prejudice within the compass of the 'cause and prejudice' requirement exists when the suppressed evidence is 'material' for *Brady* purposes," i.e., "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Banks*, 540 U.S. at 691; *Strickler*, 527 U.S. at 280 (quotation marks omitted).

On careful review of the record, the Court concludes evidence of Blakely's alleged promise of leniency does not meet this standard and could not "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Strickler*, 527 U.S. at 290 (cleaned up). Mitchell's testimony placed petitioner at the scene of the crime. If Blakely offered Mitchell leniency in exchange for his testimony, and the jury knew that, that could have impacted their assessment of his credibility. Such evidence should be disclosed. *See Napue v. Illinois*, 360 U.S. 264, 269 (1959). But the jury also heard testimony from multiple other witnesses that they were sure petitioner was in the house and participated in the burglary. And the prosecution presented considerable other evidence linking petitioner to the crime, including the video of him purchasing ski masks right before the burglary, the matching ski mask tag in his car, and his lack of an alibi and admitted proximity to the crime. *Cf. Strickler*, 527 U.S. at 293-94.

11

In addition, all the witnesses who placed petitioner at the scene were questioned about their criminal records and incentives to testify. Petitioner's co-defendants said they had been offered, or hoped for, leniency in exchange for their testimony. Petitioner's trial counsel attacked Mitchell's credibility, including mentioning repeatedly that Mitchell testified "in orange" and arguing that he and many of the prosecution's other witnesses "have a reason to lie." Doc. #10-1 at 633. The jury could credit the consistent accounts of these witnesses placing petitioner at the scene, despite their credibility issues. "The record provides strong support for the conclusion that petitioner would have been convicted" even if Mitchell had testified that he was offered leniency for his testimony and had been impeached on that point. *See Strickler*, 527 U.S. at 294-95. Because "petitioner has not shown that there is a reasonable probability that his conviction or sentence would have been different had [this evidence] been disclosed," claim 1 is denied. *Id*. at 296.

**Claim 2.** In his second due process claim, petitioner claims Blakely coerced Mitchell to give false testimony, namely, that he saw petitioner at the scene of the crime. To show prejudice and succeed on this claim, petitioner must show some "'reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *See United States v. Clay*, 720 F.3d 1021, 1025 (8th Cir. 2013) (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976)); *see also Napue v. Illinois*, 360 U.S. 264, 269 (1959).

Petitioner failed to make this showing. Mitchell supposedly claims he lied about seeing petitioner at the crime. Even if so, Mitchell also testified he heard petitioner before he saw him and recognized his voice. His affidavit does not recant that testimony. It is

12

consistent with Hamilton's testimony; both testified Mitchell said he heard "Red" and asked why he was in the house right before men with guns came in the back room.

At least four other witnesses also placed petitioner in the house. Hamilton and Andrews testified they heard petitioner at the scene and could identify him by his voice. Two of petitioner's co-defendants testified petitioner participated in the crimes and gave similar accounts of what occurred and petitioner's role. As detailed above, the prosecution presented considerable other evidence linking petitioner to the crime. On this record, petitioner has not shown any reasonable likelihood that the allegedly false testimony could have affected the jury's judgment. *See Clay*, 720 F.3d at 1025.

It appears that petitioner references Blakely because of his accusation that Blakely coerced Mitchell to give false testimony. Petitioner does not identify any allegedly false testimony from Blakely himself. Petitioner submitted several affidavits from individuals claiming Blakely pressured them to lie or give false testimony in other cases. The Court has reviewed the entire record and recognizes the seriousness of petitioner's accusations. Nonetheless, petitioner has not shown any reasonable likelihood that the alleged misconduct impacted the outcome in his case. As petitioner has not shown prejudice or materiality, claim 2 is denied.

**2. Petitioner's ineffective assistance claims (Claims 3 – 8) fail.**

Petitioner's Claims 3 – 8 allege ineffective assistance of counsel. This Court's review of ineffectiveness claims under § 2254 is "doubly deferential," meaning this Court must give "both the state court and the defense attorney the benefit of the doubt." *Burt v.*

*Titlow*, 571 U.S. 12, 15 (2013) (quotation marks omitted). Effectiveness of trial counsel is governed by *Strickland v. Washington*, 466 U.S. 668 (1984), which requires a showing of deficient performance—"errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment"—and prejudice—"counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. This Court is not a forum to relitigate the *Strickland* standard. Rather, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Harrington*, 562 U.S. at 101. "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* at 105.

Petitioner raised claims 3, 4, 5, and 7 in his state post-conviction proceedings. The Missouri Court of Appeals summarized the relevant evidence as to claims 3-5 as follows[6]:

Multiple attorneys were appointed to represent Movant during the course of his case. [Jeffrey] Rosanswank represented Movant during the early stages of plea bargaining.

While representing Movant, Rosanswank received a plea offer from the State that dropped Count 1 and Count 2 and recommended a sentence of fifteen years. Rosanswank conveyed the offer to Movant, but Movant rejected it. In conveying that rejection to the State, Rosanswank stated that he believed there was "substantially more evidence that [Movant] was not at the scene of the robbery than there [was] evidence that [Movant] was." Rosanswank then asked the State to consider recommending an eight-year sentence instead.

---

[6] The Missouri Court of Appeals affirmed without issuing a formal opinion on the basis that "an opinion would have no precedential value." Doc. #10-13 at 1. The court provided the parties "a written statement, for their information only, setting out the basis for the court's decision." *Id.*

The State did not agree to offer an eight-year sentence, and when Rosanswank moved to California, Movant hired [Ted] Luby.  While Movant did not have an ideal relationship with Luby and they occasionally had heated conversations, they were still able to communicate.  The only plea offer the State made during Luby's representation was for a twenty-year sentence. Luby urged Movant to accept this offer based upon his evaluation of the State's evidence, but Movant rejected the offer and proceeded to trial.

Throughout Luby's representation, Movant went "back and forth" on whether he wanted Luby to withdraw from his case.  When Movant finally decided that he wanted Luby to withdraw, Luby filed a motion to withdraw. That motion was made on the morning of trial, and the trial court denied it.

Even though Luby's motion to withdraw was denied, Luby was still prepared for trial.  Luby tried the case along with another attorney that Luby had hired at his own expense to handle certain portions of the trial.  The jury acquitted Movant of Count 1 and Count 2, but it found him guilty of Count 3, Count 4, and Count 5.

Doc. #10-13 at 3.  The court then cited and applied the *Strickland* standard.

**Claim 3.**  Petitioner argued his trial counsel misinformed him about accessory liability, which led him to reject a plea bargain he otherwise would have taken.  In denying this claim, the Missouri Court of Appeals stated the correct legal standard:

Defendants are "'entitled to the effective assistance of competent counsel'" during plea negotiations. *Lafler v. Cooper*, 566 U.S. 156, 162 (2012) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 (1970)). "To show prejudice from ineffective assistance of counsel where a plea offer has lapsed or been rejected because of counsel's deficient performance, defendants must demonstrate a reasonable probability they would have accepted the earlier plea offer had they been afforded effective assistance of counsel." *Missouri v. Frye*, 566 U.S. 134, 147 (2012).

Doc. #10-13 at 5.

The court then applied that standard:

> Rosanswank testified that his "consistent response to [Movant] was that if [Movant] aided and abetted the others in the commission of the charged offenses, [Movant] was legally just as guilty as the others." Further, he "clearly advised [Movant] on several occasions that even if he wasn't present at the crime scene and did not personally participate in the robbery or beating of the victim, his knowing actions in aiding and abetting the robbery was sufficient to find him guilty under the law, assuming that the underlying facts could be proven at trial."

> Finding that testimony credible, the motion court found that Rosanswank had acted as a reasonable competent attorney, and we must defer to that credibility determination. *See Arata v. State*, 509 S.W.3d 849, 852 (Mo. App. S.D. 2017). The motion court also found that Movant failed to prove that he was prejudiced by Rosanswank's actions. Movant told Rosanswank that he would not accept a fifteen-year sentence in the case and would only accept an eight-year sentence. Rosanswank testified that Movant "categorically and repeatedly rejected the 15-year offer that was on the table during the period of [his] representation[.]"

> These findings are supported by the record and are not clearly erroneous. Point 1 is denied.

Doc. #10-13 at 5-6.

The court's analysis rests on credibility determinations and the state court's determination that counsel provided competent advice about state law. Petitioner has not shown the decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *See Harrington*, 562 U.S. at 103. Claim 3 is denied.

16

**Claim 4.** Petitioner alleged his trial counsel failed to advise him that he could enter an *Alford* plea. *See North Carolina v. Alford*, 400 U.S. 25, 38-39 (1970). The Missouri Court of Appeals analyzed this claim as follows:

> Luby testified that he discussed the concept of an *Alford* plea with Movant and that Movant never made any specific request that Luby attempt to obtain a deal based on an *Alford* plea. In fact, Luby testified that Movant "didn't want to plead, period."
>
> The motion court was entitled to credit that testimony and did so. *See Arata*, 509 S.W.3d at 852. Point 2 is denied.

Doc. #10-13 at 6 (footnote omitted).

As in claim 3, the Missouri Court of Appeals correctly identified the appropriate legal standard governing assistance of counsel during plea negotiations. It then reasonably applied it, concluding, based on testimony, that counsel informed petitioner of his options but petitioner did not want to plead. Petitioner has not shown the decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *See Harrington*, 562 U.S. at 105. Claim 4 is denied.

**Claim 5.** Petitioner alleged his trial counsel failed to promptly withdraw when an irreconcilable conflict of interest arose and their communication broke down. The Missouri Court of Appeals cited *State v. Cobbins*, 445 S.W.3d 654 (Mo. App. 2014), for the legal standard: "As a general matter, '[n]either disagreement about trial strategy nor a general dissatisfaction with the amount of time defendant is able to spend with counsel is

sufficient to establish a total breakdown in communication.'" Doc. #10-13 at 7 (quoting

*Cobbins*, 445 S.W.3d at 659).

The court then applied that standard:

Here, Luby testified that throughout his representation of Movant, he had "substantial interaction" with Movant, including coming to the jail to see Movant numerous times. Luby testified that he and Movant "talked often" and there was "a lot of conversation[.]" Luby testified that while some conversations with Movant were "elevated[,]" he and Movant were still able to communicate with each other.

Luby also testified that Movant would go "back and forth" as to whether Movant wanted him to withdraw from his case. When Movant finally decided that he did not want Luby on his case, Luby honored that request and filed a motion to withdraw. When that motion to withdraw was denied, Luby was prepared for trial. During that trial, Luby and Movant never argued and got along well.

The motion court did not clearly err in crediting that testimony and finding that Luby was not ineffective for failing to attempt to withdraw from Movant's case until the day of trial. Point 3 is denied.

Doc. #10-13 at 7.

The court's analysis resulted from "an adequate inquiry into the nature and extent"

of the alleged breakdown in attorney-client communication. *See United States v. Taylor*,

652 F.3d 905, 908 (8th Cir. 2011). The right to counsel "does not involve the right to a

meaningful relationship between an accused and his counsel . . . the proper focus in

evaluating claims of dissatisfaction with counsel is on the quality of advocacy," which is

what the court considered. *See id.* at 908-09 (cleaned up). Petitioner has not shown the

decision "was so lacking in justification that there was an error well understood and

comprehended in existing law beyond any possibility for fairminded disagreement." *See Harrington*, 562 U.S. at 105.  Claim 5 is denied.

**Claim 6.**  Petitioner claims his trial counsel was ineffective by failing to interview Deshira Washington and present her testimony at trial.  Petitioner raised this claim in his post-conviction motion, but he did not raise it on post-conviction appeal, which means the claim is procedurally defaulted.  *See Sweet*, 125 F.3d at 1150; *see also Arnold v. Dormire*, 675 F.3d 1082, 1087 (8th Cir. 2012) ("In Missouri, a claim must be presented at each step of the judicial process in order to avoid default." (cleaned up)).

Petitioner attempts to overcome this default by invoking *Martinez v. Ryan*, 566 U.S. 1 (2012), where the Supreme Court recognized that "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial."  *Id*. at 9.  Petitioner claims his default occurred at his initial-review collateral proceedings because his post-conviction counsel failed to put on sufficient evidence at the post-conviction hearing.

Petitioner's argument fails.  Petitioner's counsel raised this ineffective assistance claim in post-conviction proceedings.  Petitioner received a hearing.  The motion court denied the claim.  The default occurred when petitioner failed to raise this claim in his post-conviction appeal.  Petitioner attempts to invoke *Martinez* to excuse that default; "*Martinez* offers no support, however, for the contention that the failure to preserve claims on appeal from a postconviction proceeding can constitute cause."  *Arnold*, 675 F.3d at 1087. Petitioner's claim was "litigated in his initial-review collateral proceeding, but not

preserved on appeal. Thus, unlike Martinez, [petitioner] has already had his day in court; deprivation of a second day does not constitute cause." *Id.* Claim 6 is denied.

**Claim 7**. Petitioner claims his trial counsel was ineffective for failing to object to highly prejudicial and irrelevant evidence, including "unrelated firearm and drug evidence and an incident involving a customer at Wal-Mart." Petitioner did not raise his ineffective assistance claim regarding failure to object to the incident at Walmart in his post-conviction appeal, meaning it is procedurally defaulted. *See id.*; *Sweet*, 125 F.3d at 1150.

Petitioner did raise the claim about the firearm and drug evidence in his post-conviction appeal. The Missouri Court of Appeals analyzed it as follows:

> "Ineffective assistance of counsel is rarely found in cases where trial counsel has failed to object." *Bradley v. State*, 292 S.W.3d 561, 564 (Mo. App. E.D. 2009); *Murphy v. State*, 512 S.W.3d 125, 130-31 (Mo. App. E.D. 2017). "In many instances seasoned trial counsel do not object to otherwise improper questions or arguments for strategic purposes." *State v. Tokar*, 918 S.W.2d 753, 768 (Mo. banc 1996). Typical reasons for not objecting are to avoid: (1) highlighting the statements complained of, resulting in more harm than good; and (2) annoying the jury with repeated objections. *Id.* Further, to establish ineffective assistance of counsel based on counsel's failure to object, Movant must show that the failure to object resulted in a substantial deprivation of his right to a fair trial. *Nigro v. State*, 467 S.W.3d 881, 886 (Mo. App. W.D. 2015).

> Here, the motion court found that Luby's decision not to object constituted reasonable trial strategy. *See id.* at 886. Luby testified that had he objected to everything, he believed it could have prejudiced the jury against Movant. Further, the robbery itself was motivated by a desire to obtain drugs, and it was carried out with the use of guns. The motion court could reasonably find under those circumstances that evidence of other drugs being found inside Movant's girlfriend's mattress was of little or no consequence, and Luby was able to elicit that a rifle was not used in the

robbery. Luby chose not to object in support of a strategy to suggest to the jury that the State was trying to "overkill" Movant's guilt. Luby testified that he sometimes employs this strategy to show that the State is "presenting all this evidence that didn't have anything else to do with the case" in order to discredit the State.

Moreover, the motion court found that Movant was not prejudiced by any failure to object. Luby testified that the evidence in this case was "probably some of the most incriminating evidence [he'd] seen" in "any criminal case." He based this conclusion on the testimony of three eyewitnesses, Movant's proximity to the area, Movant's lack of an alibi witness, Movant having bought ski masks that were used by the robbers, and the police locating the tag from one of the ski masks in Movant's car.

The motion court did not clearly err in finding that the evidence against Movant was "overwhelming" and that any failure to object was not outcome determinative. Point 4 is denied.

Doc. #10-13 at 8-9.

Petitioner does not identify any way in which this analysis was contrary to, or unreasonably applied, applicable Supreme Court precedent or was based on an unreasonable determination of the facts in light of the evidence presented. The court's analysis comported with *Strickland*, which requires showing a deficiency "'sufficient to undermine confidence in the outcome,'" *i.e.*, a reasonable probability that but for the failure to object, the result would have been different. *See Close v. United States*, 679 F.3d 714, 716, 718 (8th Cir. 2012) (quoting *Strickland*, 466 U.S. at 694). Claim 7 is denied.

**Claim 8**. In claim 8, petitioner claims his appellate counsel was ineffective for failing to raise the issue of racial prejudice based on the racial slur the trial court required petitioner to repeat for voice identification purposes. Petitioner did not raise this claim in

21

his post-conviction appeal, which means it is procedurally defaulted. *Sweet*, 125 F.3d at 1150. Petitioner again attempts to invoke *Martinez*. But because this claim asserts ineffective assistance of appellate counsel, petitioner cannot rely on *Martinez* to excuse his default. *See Davila v. Davis*, 137 S. Ct. 2058, 2065-70 (2017). Claim 8 is denied.

   **3. Petitioner's claims of trial court error (Claims 9 – 11) fail.**

Petitioner's last three claims allege trial court error.

**Claim 9.** Claim 9 alleges the trial court erred in compelling petitioner to read a statement in open court for voice identification purposes when he did not testify, in violation of the Fifth and Fourteenth Amendments. Petitioner raised Claim 9 on direct appeal. The Missouri Court of Appeals analyzed it thoroughly:

> It is well settled that requiring a defendant to speak for identification purposes does not come within the privilege against self-incrimination. *United States v. Wade*, 388 U.S. 218, 223 (1967). "Nor is [a defendant's] privilege against self-incrimination violated by an order of the trial court requiring him to speak, for voice identification purposes, in the presence of the jury." *State v. Mitchell*, 755 S.W.2d 603, 609 (Mo. App. E.D. 1988).

> The case law is clear that a trial court may require a defendant to make statements for voice identification purposes. For example, in *Mitchell*, the State asked defendant to make several statements similar to those made during a robbery committed by someone wearing a ski mask. *Id*. at 608. After defendant made the statements, the witness testified that he recognized the voice as belonging to the person who robbed him. *Id*. The defendant argued the trial court erred in requiring him to speak to the jury because his constitutional privilege against self-incrimination was violated. *Id*. 608-09. The court concluded "[t]he trial court did not err in requiring the defendant to utter the words used by the perpetrator, for it allowed the jury to determine itself if the defendant had a distinctive voice, as testified [by the witness].

Further, it allowed [the witness] to make an in-court identification of the voice." *Id*. at 609.

Here, similarly, statements were made during the robbery by an individual wearing a ski mask. Dewayne testified that when the individuals first came to the Washington residence, he could not tell who they were because they had masks covering their faces. Later, he recognized Robinson's voice when they started talking because Robinson has a "raspy voice" and had a "southern kind of accent." The trial court requested Robinson make a statement that was made to witness Dewayne for voice identification purposes. After Robinson made the statement in front of the jury, Dewayne recognized Robinson's voice as the voice of the person who robbed him. Not only did the statement allow Dewayne to identify Robinson, the statement allowed the jury to determine itself if Robinson had a "raspy voice" and a "southern accent" as testified to by Dewayne.

Based on *Mitchell*, we reject Robinson's argument that this violated his Fifth Amendment right. The phrase was not admitted as testimony, but rather allowed Dewayne to make an in-court identification of the voice he heard during the robbery. Robinson repeatedly labels his statement made to the jury as cumulative "testimony." By doing so, Robinson completely overlooks the reason the trial court required him to make the statement to the jury— for voice identification purposes. Immediately after Robinson made the statement, the State continued direct examination of Dewayne:

> [State:] [Dewayne], is that what you heard that night?
>
> [Dewayne:] Yep. . . . Yeah, that is it.

Robinson primarily argues that his statement was cumulative and prejudicial because Dewayne had "prior dealings" with Robinson without citation to any authority in support of his argument. "An appellant must support his arguments with relevant authority or explain why such authority is not available." *Johnson v. State*, 103 S.W.3d 182, 187 (Mo. App. W.D. 2003). Robinson has not cited any authority in support of his argument.

The fact that a witness may know the defendant does not make the statement cumulative when done for identification. This is evident in *Mitchell*, where the witness recognized the defendant based on the defendant's "distinctive voice, which he remembered from elementary school, junior high school, and from other contacts since school." *Id*. at 605. Here, the fact that Dewayne had prior dealings with Robinson did not make the evidence cumulative. At the time of the robbery, Robinson had on a ski mask and gloves so his face was not visible, making it impossible for Dewayne to identify him visually.

The record reveals that the trial court carefully considered the State's request, Robinson's objections, and the case law presented to the trial court. We find the trial court did not abuse its discretion in requiring Robinson to repeat a phrase to the jury for voice identification purposes.

Doc. #10-5 at 7-10 (footnotes omitted).

In *United States v. Wade*, 388 U.S. 218 (1967), the Supreme Court held it is constitutional to compel a defendant to speak for voice identification purposes in front of witnesses at a pre-trial lineup. *See id.* at 223. Requiring a defendant to "use his voice as an identifying physical characteristic" is "not compulsion to utter statements of a 'testimonial' nature," even when he is required to repeat words purportedly said by the perpetrator of the crime at issue. *Id.* at 222-23. Here, the Missouri Court of Appeals also relied on *State v. Mitchell*, 755 S.W.2d 603 (Mo. App. 1988), which interpreted *Wade* to permit compelling a defendant to speak in the presence of the jury for voice identification purposes. *See id.* at 609; *see also United States v. Leone*, 823 F.2d 246, 250-51 (8th Cir. 1987) (concluding, under *Wade*, that requiring defendant to repeat phrases in front of the jury for voice identification did not violate Fifth Amendment). Petitioner does not identify

24

any contrary Supreme Court precedent or any way in which the state court's decision contradicted the Court's decisions. Claim 9 is denied.

**Claim 10**. Claim 10 alleges the trial court erred in admitting evidence that petitioner bought ski masks and gloves as it was more prejudicial than probative, violating his due process rights. Petitioner did not object to the underlying evidence at trial. As a result, the Missouri Court of Appeals concluded the claim was not properly preserved, meaning it is procedurally defaulted. *See Clark v. Bertsch*, 780 F.3d 873, 874 (8th Cir. 2015). Petitioner argues this Court can still review the claim because the Missouri Court of Appeals reviewed it for plain error. But in *Clark*, the Eighth Circuit held that "a federal habeas court cannot reach an otherwise unpreserved and procedurally defaulted claim merely because a reviewing state court analyzed that claim for plain error." *Id*. Petitioner's argument that *Clark* only applies to North Dakota cases and not Missouri cases fails. *See id.* at 875-76 (citing *Bannister v. Armontrout*, 4 F.3d 1434 (8th Cir. 1993), and explaining *Clark* resolved an intra-circuit split in cases from various states, including Missouri); *see also, e.g.*, *Nettles v. Stange*, 2021 WL 2042270 at *2 n.1 (E.D. Mo. May 21, 2021) (slip copy) (applying *Clark* to Missouri plain-error review).

Thus, this Court can consider the merits of this claim only if petitioner shows cause and prejudice, or that a fundamental miscarriage of justice would occur if the Court does not address the claim. *See Coleman*, 501 U.S. 750. Petitioner argues cause and prejudice is established due to his trial counsel's ineffectiveness in failing to properly preserve these claims by objecting and raising them in a motion for new trial. *See Manning v. Bowersox*,

310 F.3d 571, 576 (8th Cir. 2002) ("Cause, in this respect, can include a showing of ineffective assistance of counsel."). Petitioner does not go on to advance any argument, though, tending to show his trial counsel was ineffective for failing to object to this evidence or that there was a reasonable probability that the outcome may have been different if counsel had objected. *See Close*, 679 F.3d at 716. Claim 10 is denied.

**Claim 11**. Claim 11 alleges the trial court erred in allowing Blakely to testify about hearsay statements from petitioner's co-defendants, Julius Hudson and Fabayan Larry, in violation of his Sixth and Fourteenth Amendment rights. Again, petitioner did not object to the underlying evidence at trial, and the Missouri Court of Appeals applied plain-error analysis. But the court could not even make a plain-error determination because petitioner did not identify what specific testimony was allegedly in error. That issue continues here, as petitioner only generally states the trial court "erred in admitting the testimony of Detective Blakely as to the hearsay statements of Julius Hudson and Fabayan Larry" without identifying any specific problematic testimony. Doc. #19 at 19; *see also* Doc. #26 at 3-4, 16-19. The Court applies the same analysis as in claim 10 as to procedural default. This Court cannot analyze cause and prejudice based on ineffectiveness of counsel when petitioner does not identify which specific testimony counsel allegedly should have objected to. Petitioner also does not advance any argument or cite any relevant authority supporting this claim. For all these reasons, claim 11 is denied.

### Certificate of Appealability

To grant a certificate of appealability, the Court must find a substantial showing of the denial of a federal constitutional right. *See Tiedeman v. Benson,* 122 F.3d 518, 522 (8th Cir.1997). "A substantial showing is a showing that issues are debatable among reasonable jurists, a court could resolve the issues differently, or the issues deserve further proceedings." *Cox v. Norris,* 133 F.3d 565, 569 (8th Cir.1997). Petitioner has not made such a showing in this case, so the Court will not issue a certificate of appealability.

Accordingly,

**IT IS HEREBY ORDERED** that petitioner's application for writ of habeas corpus pursuant to 28 U.S.C. § 2254 is **DENIED**.

**IT IS FURTHER ORDERED** that the Court will not issue a Certificate of Appealability. *See* 28 U.S.C. § 2253.

A separate judgment will accompany this order.

Dated this _10th_ day of _November_, 2021.

_____
STEPHEN N. LIMBAUGH, JR.
SENIOR UNITED STATES DISTRICT JUDGE